Betty EBY, a widow, Plaintiff-Appellee,

v.

REB REALTY, INC., an Arizona corporation, and Don Dailey Realty, an Arizona corporation, Defendant-Appellant.

No. 72-2245.

United States Court of Appeals, Ninth Circuit.

April 1, 1974.

George W. Oglesby (argued), Phoenix, Ariz., for defendant-appellant.

James K. LeValley (argued), Phoenix, Ariz., for plaintiff-appellee.

OPINION

Before ELY, CHOY and GOODWIN, Circuit Judges.

CHOY, Circuit Judge:

Betty Eby brought an action in two counts under the Truth in Lending Act, 15 U.S.C. §§ 1601–1665, seeking (1) rescission of a secured real estate credit transaction under section 1635 of the Act and (2) twice the amount of the finance charge paid by her in the same transaction under section 1640. The suit was based on the admitted failure of the defendant, Reb Realty, to make certain disclosures of credit terms and rescission rights normally required by the Act. The parties filed cross motions for summary judgment, and the district court granted Eby both forms of relief she requested. Reb Realty appeals. We affirm.

### Background

In October of 1969 Eby purchased a home from appellant for $16,700. The contract of sale provided that $600 would be paid as a down payment, that Eby would assume an existing Veterans' Administration mortgage for $11,900, and that a second mortgage would be executed in Reb Realty's favor for the balance of $4,200 payable in installments with 8% simple interest. Eby paid a total of $1,252 under the agreement: the down payment of $600, closing costs of $51, and $601 under the first mortgage, $239.41 of which represented interest. Nothing was paid towards the second mortgage. When this default occurred, Reb Realty instituted forcible detainer proceedings, successfully reentering possession in March, 1970. Eby then brought the present action.

In general, the Truth in Lending Act requires a "creditor" to disclose credit terms—for example, the annual interest rate—to a borrowing consumer. See 15 U.S.C. § 1638. Failure to make the requisite disclosures can subject the credi-

tor to civil liability in an amount equal to double the finance charge paid in connection with the transaction, but in no event less than $100 or more than $1,000. 15 U.S.C. § 1640(a)(1). Additional duties are imposed on a creditor —and different borrower rights come into play—when a security interest is retained or acquired, as part of a credit transaction, in any real property "which is used or expected to be used as the residence" of the borrower. 15 U.S.C. § 1635(a). The debtor is given a right of rescission which must normally be exercised within three days of the consummation of the transaction. The lender must provide the borrower with written notice of this limited right to rescind in addition to making all the other usual disclosures required with any extension of credit. When the creditor fails to disclose any item of the requisite information, the right to rescind is not limited by the normal three day period but continues until all the disclosures are made. 15 U.S.C. § 1635(a).

■ Under the civil liability section, section 1640, the district court awarded Eby $478.82, twice the amount of interest she paid.[1] In granting rescission of the sale agreement and the two mortgages under the second count, the court ordered the return of the $1,252 paid by Eby under the agreement, an amount which included the principal and interest paid under the first mortgage.[2] By stipulation this was reduced by the rental value of the premises during appellee's possession, a sum of $830, resulting in a net rescission award of $422.

1. In addition, Eby was given her attorney's fees, as provided by § 1640(a)(2) of the Act, for the successful prosecution of the civil liability count.

2. In granting rescission of the first mortgage, the district court may have erred, since § 1635(e) of the Act insulates from rescission "the creation or retention of a first lien against a dwelling to finance the acquisition of that dwelling." However, appellant, though arguing this point below, did not raise it here. This court will not consider questions not presented to it except that a plain error may, at the court's option,

*Propriety of Summary Judgment*

The Act does not impose its disclosure duties on, nor accord a right of rescission against, every person extending credit, but applies only to those "who regularly extend, or arrange for the extension of, credit . . . whether in connection with loans, sales of property or services, or otherwise." 15 U.S.C. § 1602(f). Appellant raises two issues concerning the application of this definition to it: (1) that it was improper to decide its creditor status on summary judgment since that was a disputed issue of fact, *see* F.R.Civ.P.R. 56(c), and (2) that in any event it is not a creditor within the statutory definition.

As far as the record revealed at summary judgment, appellant is primarily a real estate broker acting as an intermediary between purchasers and sellers. However, between the date of its incorporation in February, 1969 and the pendency of this case below in September, 1970—a time span of nineteen months —Reb Realty sold seven parcels of property for its own account. In three instances, including the sale to appellee, credit was extended by Reb Realty. The credit sales were made in April, 1969, October, 1969, and August, 1970.

■ Summary judgment is, of course, appropriate only when there are no disputed issues of "fact," and only "legal" issues remain to be decided. And while the question of what is law or fact is one that has continually bedeviled courts, in this case it is neither analytically nor practically [3] difficult to determine in which category the finding of

be noticed. Sup.Ct.R. 40(1)(d), (2), as adopted by 9th Cir.R. 5. Even assuming the district court committed plain error, we decline to notice it.

3. The terms are Professor Davis'. See K. Davis, Administrative Law Treatise § 30.01 (1958). They refer to two different approaches to the law-fact knot developed to determine which findings of administrative agencies should be accorded the deference normally given factual findings. The analytic—the approach championed by Professor Jaffe—starts with a definition of facts to reach its conclusions. See L. Jaffe, Judicial

creditor lies.[4] The number of realty sales made by Reb Realty, the number that were on credit, etc., are facts. The application of the term "creditor" to those basic facts, a process requiring the court to look to statutory purpose and legislative intent, is a function of a court as law-finder and, hence, a legal conclusion appropriate for summary decision. *See, e. g.,* Kentucky Rural Electric Cooperative Corp. v. Moloney Electric Co., 282 F.2d 481, 483–484 (6th Cir. 1960), cert. denied, 365 U.S. 812, 81 S.Ct. 692, 5 L.Ed.2d 691 (1961); Leas v. Courtney Co., 261 F.2d 13 (4th Cir. 1958); Koepfle v. Garavaglia, 200 F.2d 191, 192–193 (6th Cir. 1952); 10 C.A. Wright & A. Miller, Federal Practice and Procedure § 2725 at 501 (1973).

■ Nonetheless, even when the question is denominated one of law, it will not always be proper to enter summary judgment. In certain cases summary judgment may be inapposite because the legal issue is so complex, difficult, or insufficiently highlighted that further factual elucidation is essential for its prudently considered resolution. *See, e. g.,* Kennedy v. Silas Mason Co., 334 U.S. 249, 68 S.Ct. 1031, 92 L.Ed. 1347 (1948); Palmer v. Chamberlain, 191 F.2d 532, 540 (5th Cir. 1951); 10 C. A. Wright & A. Miller, *supra* at § 2725, pp. 501–05. This is not such a case. Appellant suggests only that a trial might bring out what percentage of its profits are derived from credit transactions and the circumstances in which it acquired the properties it sold, whether by chance or design. We fail to see how knowledge of these facts would materially assist a court in applying the term "creditor."

### *"Creditor" Under The Act*

The issue is then presented whether, on the facts of record, Reb Realty "regularly extended credit" and was thus a creditor within the Act. The question is one of first impression upon which there is little guidance. The statutory definition only focuses inquiry on the word "regularly." The Federal Reserve Board's definition, contained in its interpretive regulations on the Act—Regulation Z—goes but a little further: a creditor is one "who in the ordinary course of business" regularly extends credit. 12 C.F.R. § 226.2(m) (1973).

■ The legislative history, though sparse on this point, is of some help. In both the House and Senate reports, the only comment relevant to the definition of creditor indicates that the term is to have a broad scope. "Thus a small retailer who extended credit . . . in an isolated instance to accommodate a particular customer would not be covered [by the Act]." H.R.Rep.No.1040, 90th Cong., 2d Sess. 20 (1968); S.Rep. No.392, 90th Cong., 1st Sess. 13 (1967). 1968 U.S.Code Cong. & Admin.News, p. 1962. Reading this along with the definitions in the statute and Regulation Z, the intent seems to have been to except from the Act only those lenders whose extensions of credit are an occasional, isolated, and incidental portion of their business.

■ Informal letters, issued by the staff of the Federal Reserve Board, are a further indication that the term "cred-

Control of Administrative Action 546–49 (1965). Professor Davis' practical approach looks to which decision-maker—court or agency—would be best able or which should (i. e. as a matter of policy) decide a question. *See* K. Davis, *supra* at § 30.04. Though developed in another context, the approaches are helpful in resolving law-fact problems in a summary judgment setting.

4. It is not sufficient to say that since both parties moved for summary judgment, there were no disputed issues of fact. It is well settled that a court's duty to ascertain whether facts remain in contention is not obviated by cross motions for summary judgment. *See, e. g.,* Pioneer Nat. Title Ins. Co. v. American Cas. Co., 459 F.2d 963, 967 (5th Cir. 1972); Brawner v. Pearl Assurance Co., 267 F.2d 45, 46 (9th Cir. 1958); 6 J. Moore, Federal Practice § 56.13 at 2247–48 (2d ed. 1972).

itor" should be expansively read. While these letters are hardly binding on a court, they do represent an "experience[d] and informed judgment to which courts . . . may properly resort for guidance." Skidmore v. Swift & Co., 323 U.S. 134, 140, 65 S.Ct. 161, 164, 89 L.Ed. 124 (1944).[5] Bone v. Hibernia Bank, 493 F.2d 135 (9th Cir. 1974); Taylor v. R. H. Macy & Co., 481 F.2d 178, 180 (9th Cir.), cert. denied 414 U.S. 1068, 94 S.Ct. 577, 38 L.Ed.2d 473 (1973). In one letter, for example, a homeowner was advised that he would not be a creditor simply because he accepted a mortgage in the sale of his own home. Letter from Milton W. Schober, Ass't Director, Nov. 4, 1969, reported at 4 CCH Consum. Credit Guide ¶ 30,206.[6] More importantly, a 1970 staff letter opined that a corporation, distributing its stock on credit, would be a creditor for purposes of disclosing the credit terms of the sale. "[I]t appears to us that the restriction of the application of the Act to 'creditors' was included merely because of the unfairness in placing a burden on a private party to make disclosures in connection with his *casual isolated* sales." Letter from Milton W. Schober, Ass't Director, Feb. 19, 1970, reported at 4 CCH Consum. Credit Guide ¶ 30,313 (emphasis added).

[7, 8] The Truth in Lending Act is a remedial statute designed as much as possible to permit borrowers to make informed judgments about the use of credit. To effectuate this congressional purpose requires that the Act's terms be liberally construed. *See* N. C. Freed Co. v. Board of Governors, 473 F.2d 1210, 1214 (2d Cir.), cert. denied 414 U.S.

827, 94 S.Ct. 38 L.Ed.2d 61 (1973); Gardner & North Roofing & Siding Corp. v. Board of Governors, 150 U.S. App.D.C. 329, 464 F.2d 838, 841 (1972). Here, realty sales were a significant aspect of appellant's business. And in nearly half its sales, it extended credit to its customers. They were credit transactions involving a large amount of money and not, after all, like granting credit for a bag of groceries. In view of this, we cannot say Reb Realty's extensions of credit were the type of isolated and incidental transactions the definition of creditor was meant to exempt.

To hold otherwise would undermine the remedial objective of the statute. Undoubtedly, a considerable number of land sales are effected by real estate brokers acting as sellers, and in a large percentage of those, the broker must, in this age of credit, either provide credit or arrange for its extension, both of which may subject the lender to the Act. *See* 15 U.S.C. § 1602(f). To except appellant here, then, might well insulate a significant credit market from the Act.

Finally, an additional factor influencing our decision is that a real estate broker like appellant is unlikely to be unduly burdened or surprised by the Act's mandates. Probably one reason Congress exempted those not regularly extending credit from the Act was that such persons could not be expected to know the law or be able, without considerable trouble, to follow its directives. Real estate brokers constantly deal with credit, either as principals or in assisting purchasers. They are, therefore, likely to be familiar with the general requirements of the Act and to be capable of implementing its requirements.[7] *See*

5. The weight of such a judgment in a particular case will depend on the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control.
Skidmore v. Swift & Co., 323 U.S. 134, 140, 65 S.Ct. 161, 164, 89 L.Ed. 124 (1944).

6. *See also* letter from Griffith L. Garwood, Chief, Truth in Lending Section, Feb. 7,

1972, reported at 4 CCH Consum. Credit Guide ¶ 30,802; letter from Frederic Solomon, Director, July 28, 1969, reported at 4 CCH Consum. Credit Guide ¶ 30,117.

7. In the Board staff letter described earlier, advising a corporation to disclose the credit terms of its stock distribution plan, the writer based his opinion partially on this factor. "The reasoning behind the [noncreditor] exemption was probably that the private individual could not be presumed to

*generally* Warren & Larmore, Truth in Lending: Problems of Coverage, 24 Stan.L.Rev. 793, 823–24 (1972).

### The Damages Awarded

■ Appellant next challenges the district court's damage award. It urges that by permitting section 1635(a) rescission of the interest paid under the first mortgage and by awarding double that same interest charge under section 1640(a)(1), that court granted a triple recovery Congress could not have intended.

Neither the words of the statute nor the legislative history refer to the intended relationship between the rescission and civil liability provisions. Doubtless, this is because the rescission provision was introduced late in the legislative process. After the Senate had passed one version of the Truth in Lending Act, another version was presented before the House. During the debate on that bill, Congressman Cahill proposed an amendment requiring lenders to make the necessary disclosures three days earlier than usual if a security interest was to be retained or acquired in the borrower's home. Apparently, failure to comply would have subjected the creditor to civil liability equal to twice the finance charge, just like the failure to disclose any other information. The amendment was adopted without debate. 114 Cong.Rec. 1611 (1968). With no explanation the conference committee altered this to its present form to provide the limited right of rescission.

One court, relying on the absence of congressional history, has held that the two sections set forth exclusive remedies which cannot both be pursued. Bostwick v. Cohen, 319 F.Supp. 875 (N.D. Ohio 1970). *Contra,* Palmer v. Wilson, 359 F.Supp. 1099, 1103–1104 (N.D.Cal. 1973). The court reasoned that the provisions are remedial in nature; because of the lack of a clear legislative state-

ment to the contrary, the court thought that the borrower should be forced to comply with the traditional rule requiring an election of remedies. Bostwick v. Cohen, *supra,* at 877.

We do not agree. The doctrine requiring election is premised on there being two inconsistent *remedies.* In Mourning v. Family Publications Service, Inc., 411 U.S. 356, 93 S.Ct. 1652, 36 L.Ed.2d 318 (1973), however, the Court entirely undercut this premise. *See* Palmer v. Wilson, 359 F.Supp. at 1103–1104. The Court there upheld Regulation Z's four installment rule, 12 C.F.R. § 226.2(k), which requires credit disclosure in any transaction payable in more than four installments though no actual finance charge is exacted. The creditor had argued that there could be no civil liability under section 1640 where there was no finance charge. Mourning v. Family Publications Service, Inc., *supra,* at 376, 93 S.Ct. 1652. Rejecting this argument, the court characterized section 1640's damage provision as a "civil penalty" the applicability of which depends not on the finance charge levied, but on the failure to make disclosures. *See id.* at 376, 93 S.Ct. 1652. *See also* Ratner v. Chemical Bank New York Trust Co., 329 F.Supp. 270, 280 (S.D.N.Y.1971). As the *Bostwick,* court admitted, 319 F.Supp. at 877, if the civil liability provision is so viewed as penal and not remedial, it is not inconsistent with a right of rescission since civil liability is not then aimed at making the borrower whole.

The structure of section 1640 leads to the same conclusion. By providing a minimum recovery of $100 regardless of the presence of a finance charge or its *de minimis* amount, Congress indicated that the finance charge was to be no more than a convenient measure for damages and not a remedial trigger upon which liability was to depend. Equally inconsistent with a view of sec-

---

know about the Regulation [Z] or have procedures to implement it." A corporation distributing its stock, the letter concluded, is a "sophisticated party fully able to make

disclosures." Letter from Milton W. Schober, Ass't. Director, Feb. 19, 1970, reported at 4 CCH Consum. Credit Guide ¶ 30,313.

tion 1640 as remedial is the recovery limit of $1,000. If the finance charge, for example, should exceed $1,000, civil liability would obviously be inadequate to compensate a debtor. Finally, a defense to section 1640 is that the creditor's violation of the Act was unintentional. 15 U.S.C. § 1640(c). Since liability is thereby dependent to some degree on culpability, this is another index that the section could not be wholly remedial in character. In sum, since section 1640 was not intended as a remedy, it is not inconsistent with a rescission award covering the same finance charge and not, therefore, subject to election of remedies.

Even aside from the labels that might be attached, it would undermine the effectiveness of the Truth in Lending Act to require borrowers to choose their remedies. The purpose of making creditors civilly liable is to force disclosure of credit terms. The purpose of according borrowers a right of rescission is broader; not only is it designed to compel disclosure, but it also serves to blunt unscrupulous sales tactics by giving homeowners a means to unburden themselves of security interests exacted by such tactics. *See* 114 Cong.Rec. 1611 (1968) (remarks of Cong. Cahill). If borrowers were forced to choose their "remedies," both objectives might be undermined. To the extent that only civil liability is pursued, the sanction against unscrupulous home sales practices is weakened. To the extent that only rescission is chosen—where available—the penalty attendant upon nondisclosure will be less severe and, consequently, the incentive to disclose diminished. *See* Comment, Private Remedies Under the Truth-in-Lending Act: The Relationship Between Rescission and Civil Liability, 57 Iowa L.Rev. 199, 205–07 (1971).

But while we hold that sections 1635 and 1640 do not set forth exclusive remedies, we do not say that a court must always grant both forms of relief when requested. These two separate provisions can result in a sometimes harsh

penalty. In the absence of any clear congressional statement, we think a request for both forms of relief is addressed to a court's sense of equity and may properly be denied in appropriate cases. Here, though, the district court did not abuse its equitable discretion. Its judgment is, therefore, affirmed.